Our next case is Irani v. Palmetto Health. Mr. Ehrenberg. Good morning. May it please the court. Jason Ehrenberg, Bailey and Ehrenberg, Washington, D.C. on behalf of appellant Afraaz Irani. Ahmed the terrorist, you look like you're going to blow the place up. I've fired residents like you. We're just happy to have residents who can speak English. I have the power to fire you. You can't graduate unless you appease me, as all paperwork requires my signature. Oh, and by the way, race and national origin are important factors when building a department in a hospital. The district court found that these statements made by the head of a medical residency program to an orthopedic resident of that program of Indian and Iranian descent were not sufficiently severe or pervasive to establish the hostile work environment. In other words, to alter the terms and conditions of Dr. Afraaz Irani's employment. The district court failed to consider that these particularly odious, racially charged statements, calling someone Was the hostile work environment, was the alleged hostile work environment, did it cause appellant's issues with the patient? There's a dispute of fact as to whether there were in fact true issues of patient care, but assuming for present purposes that there were issues, I believe that the treatment, not just the statements, but the treatment that went along with that would and did impact my client's employment and his ability to do his job. Is that somewhere in the record that your client wasn't able to effectively perform the job because of these comments? There's no medical testimony that establishes that my client was emotionally distressed to the point where he couldn't do his job, no. Is there an allegation even in the record that, I mean, did your client say the reason I'm having these problems with the patients is because of these comments? Again, there's a dispute of fact as to whether or not he was not performing the job at the level that was expected. Okay, so he was not even an allegation of this? I don't believe that's an allegation. I believe that he did say that the treatment disturbed him and created an environment for him. And again, it doesn't have to, a hostile work environment doesn't have to result in you not doing your job well. It just appears from the record that he was let go from the program because of these comments. Because of the patient care issues. That a number of doctors, not just the doctor that made those, we can all agree, inappropriate comments, I think. But that doctor wasn't the only one that observed issues with patient care. Doctors across the board as well as nurses. I don't believe that's factually correct. As we point out in our brief, all of the criticisms of our client that were written, the document and criticisms were all from Dr. Kuhn. Any criticism from any other doctor? Dr. Guy, who was apparently a mentor of sorts to appellant. I believe that the other doctors who reviewed our client said that his performance had improved. Dr. Guy said he didn't belong in the clinical residency. That's what Dr. Guy said. Again, I don't know particularly where in the record that site is. I apologize. I'm not questioning you. I thought you were because you said that only Dr. Kuhn had made evaluations about his performance. And that's not the case. My understanding of the record is that Dr. Kuhn is, other than maybe a stray marker to Dr. Kuhn is the only individual who was pressing for my client's termination from the program. That's a different question, though. Weren't the complaints about his performance coming from a wide range of people, doctors, nurses? I guess the answer is as reported by Dr. Kuhn. Yes, I apologize if I misunderstood. There were complaints reported by Dr. Kuhn. The complaint from the nurse, the doctor who was there with the nurse, stated that the patient care that my client provided was appropriate and professional. Dr. Kuhn disregarded that. And even assuming that the patient care was not up to par or could be or should have been criticized in some way, the record reflects that Dr. Arani was held to a different standard and received harsher discipline than similarly situated residents from outside of his protected class. JA 1619 has an example of that. Dr. Kuhn initially ranked Appellant as a top ten candidate. That's correct. What are we to do with that? I guess that's like saying if... Dr. Kuhn had met with Appellant before he ranked him as a top ten candidate, right? In person? That's correct, but just because someone hires someone, that doesn't mean that they can't be held to have a discriminatory animus in their treatment of the person. Dr. Kuhn did not call my client Ahmed the terrorist during the interview. And he's admitted to calling him that. Dr. Kuhn admitted to saying something to the effect that you look like you're going to blow the place up. So just because you hire somebody doesn't mean that you treat them the right way after you've hired them. Can we just talk briefly then I guess about, because I know we've been bouncing around a bit between hostile work environment and disparate treatment, but just to go back to the hostile work environment and the comments, which I know are of course right that Dr. Kuhn admitted to making at least one of them, and they are incredibly offensive. But just so I have a sense of the magnitude of what's going on here. So your client was hired in July 2010, and in January 2012 he reports these comments. I can remember two of them. So that's two comments in about 18 months. And then all the other things you listed were not raised in the original summary judgment motion. This report says that in the original summary judgment motion you rely just on these two comments about Ahmed the terrorist. And I don't mean by just to suggest that they're not offensive, but there's two of them. And everything else you just listed when you started with us, those were not in the original summary judgment motion and not timely advanced as a basis for the claims. And the district court did go on to consider them, but your summary judgment motion, we're just talking about these two comments over 18 months. So are you conceding sort of on the pervasive end of things, that this is not what we normally think of as pervasive? I am not. And again, unfortunately we were not counsel in the proceedings below. We've only been retained on appeal. So we're stuck with the record and the arguments that were made. But the evidence is in the record. The evidence was before the judge on summary judgment. And the court did discuss this evidence. I guess if I could just get you to focus for a minute, though, on the two comments over this 18-month period. Pervasive or not? On their own, under this court's precedent in the Boyer case, no. But when combined with these other things that, you know, such as the holding him to a different standard, assigning humiliating assignments, informing my client repeatedly that. How was he held to a different standard? The record shows that for the same incident where this nurse brought this issue to the attention, my client was placed on level two remediation. But that was in the context of the other issues that had come up with respect to your client that apparently had not come up with respect to the other individual. So in that sense, they're not the same. That's also assuming that these other residents had made no, had performed better than our client throughout. What did the evidence show? I think the evidence showed that every time there was an opportunity, our client was treated more harshly. In the abstract, but in comparison to what? You're saying that these folks, there's no basis for differentiating. What I'm suggesting to you is that the record seems to show that there was a basis separate and apart from a discriminatory basis. I believe we laid out in our briefing the instances where the other side had pointed to comparators and said that, and those comparators I believe we included reference to the joint appendix that demonstrated that when event X happened, our client received punishment Y. The other person received no punishment. We can say yes, collectively our client, Dr. Kuhn created a record wherein our client appeared to have more. So are you saying that Dr. Kuhn calls Dr. Guy to say that appellant did not belong in the orthopedic surgery residency program, which is a JA 867 to 869, or did Dr. Kuhn cause Dr. Voss to be even more negative about your client remaining in the program and in fact pointed to specific incidents where appellant fell short of the care that was expected, which is a JA 909? I'm not saying that Dr. Kuhn made that up or that Dr. Kuhn contacted those people. Well, it sounded like you were saying Dr. Kuhn created a record. Dr. Kuhn did all this, but it's not just Dr. Kuhn. It's Dr. Stephens, Dr. Voss, Dr. Guy, the nurses, the patients. I believe that the expert testimony, the expert report that was submitted that was unrebutted showed that the level of patient care was appropriate for, and this was in orthopedic. Why was it unrebutted when all these doctors who were there said the level of patient care was not adequate? The expert reviewed the medical records and came to a different conclusion. The other side did not proffer an expert or depose that expert. I see your sense is that they didn't need to because the record was so strongly... The expert is not unrebutted. It's technically, I suppose, unrebutted because there's not another expert because they had people on the ground. In our view that lends itself to creating a dispute of fact as to whether the criticisms were appropriate or accurate. We're not standing here arguing that our client was the model resident. I think what we are saying is that setting aside whether he should have been kept in the program or not, and setting aside the district treatment, I don't think there can be much dispute that there was a hostile work environment. I'm disputing it because I've got two comments over 18 months and I agree, offensive comments, but unlike the rare cases where we have found that workplace conduct that is not pervasive is nevertheless sufficiently severe to meet the standard. These comments were made not in connection with any kind of threat or not in connection with any sort of workplace-based threat. They seem like they were really offensive jokes. I see that my time is up, but if I may address that one point. There were more than two comments or incidents of what we would call harassment. Those two statements, the particularly odious ones, yes, there were only two of those, but there were other statements made such as indicating Dr. Kuhn's preference for English speakers. Dr. Kuhn's preference or statements about his views of race and national origin in the workplace. Tell me what those are because those don't look to me like they were ever raised in front of the district court. I'm looking at the part where the district court says here are the two things that were raised on summary judgment. Here's a bunch of stuff that was raised too late. I'm not even seeing those in the bunch of stuff that was raised too late. The evidence that was in the summary judgment filings at JA 1591-92. In the documents. I'm not saying that the counsel below pointed this out in his papers. Maybe let's not talk about those now. Can we at least limit ourselves to things that were brought to the district court's attention even if too late? Prior to the reconsideration motion, yes. I'm prepared to even consider the stuff at the reconsideration motion. I agree with you that the district court found and stated that those two statements alone were not sufficient. But the district court did go on to consider all the other things that were presented on reconsideration and found even with those it's not sufficient. You have to read the Shark article. Right. The other statements that though they didn't rise to the level of what we would call a racial epithet, they certainly those combined with the statements about I have the power to fire you and the fact that the person who made these statements was the head of the program. I think that that can rise to the level and that does rise to the level of a hostile work environment though I concede that we don't say that's why our client did a subpar job because we don't believe the record reflects that he does. The record reflects that he made mistakes but there's no evidence that other people in the program didn't make mistakes and other people in the program did and as we point out in our briefs they were not on the part of Ms. Helms. May it please the court. Good morning. I'm Kathy Helms and I represent Palmetto Health in this matter. I'm going to address very, very quickly two questions that were just asked and go from there. Judge Thacker you had asked and I'm going to go blank on what you had asked but I'll go to my point. Yes, Dr. Kuhn signed all of the remediations that went through as counsel. I asked whether Dr. I think you're responding to it. I asked whether Dr. Kuhn had caused all these other doctors to evaluate him negatively. You're right and he reconnected my wires. Thank you. And the answer to that in the record is very clearly he did not. Yes, he did sign things because it's an academic program and he was the program director. That is his function as a program director. The department would do the remediations and agree upon them before they would go forward but Dr. Kuhn would sign them. So yes, the written documents are signed by Dr. Kuhn. I believe what you were referring to from Dr. Voss and Dr. Guy were the additional statements requested by the grievance committee which in fact to me goes to in part do away with the theory of the cat's paw that is presented here because the grievance committee didn't just rubber stamp this. The grievance committee listened for several hours and then said we need this additional information. The cat's paw theory wasn't presented below, right? Was it? I guess I'll ask. I can't recall right now but at any rate that is evidence and it is an academic program and by the way we did depose the expert and the expert went to, it's not a malpractice case, whether or not we're not contesting that anyone was killed in any of these instances. We're not alleging anything of that sort. What the doctors and nurses have said is that Dr. Arani was lacking in compassion and that his handling of matters wasn't right. He wasn't documenting timely. When Dr. Wood went to go and check and see if he had actually checked on her patient at 4 a.m. like she asked him, he had not even documented. So here the chief resident couldn't even tell what had happened. Later they put it together and yes, he had checked on the I disagree that there is a dispute of fact as to what happened in those instances. In fact, I think in this record the material facts are pretty well agreed upon by the parties. Now the spin each party puts on it may differ but the statements, Dr. Kuhn does not deny that he made the comment that he made. We don't deny that. It's odious. Is it odious enough to be extremely serious and raise it to the point of the boiler liberto case? No, I don't think that it is. I don't think that the record demonstrates that it is. And one reason that I don't think it does is again it appears that we have two things going on. We have these comments and then we have the academic actions that are going on and they don't ever overlap. As opposed to some of the other cases where this is reviewed where a supervisor is yelling in response to a job duty or something and calling the person an inappropriate name. You don't see that here. The two Ahmed the terrorist comments that are testified to by Dr. Arani are when he was walking up and in fact one is and Dr. Arani says it may have been when I had grown a beard. And Dr. Kuhn made the comments essentially here comes Ahmed the terrorist. That's different. That is distinct in this case from it being a situation where Dr. Kuhn is saying Ahmed the terrorist can't you even get this procedure right or you don't know how to treat a patient because you're a terrorist. Those things never bleed over here. There are the comments and then all evidence. What about the comment opposing counsel said that Dr. Kuhn at one point said something to an appellant like I have the power to fire you. What about the fact that he's the head of the entire program making these comments? He's not technically the head of the program. He's a pivotal part for the residents no doubt. And the record also reflects in Dr. Kuhn's affidavit that he did not have the power alone to fire anyone. If he said that he didn't say it tied in with race in any way or national origin. Dr. Kuhn did say in the November the 3rd email that tends to be brought up frequently or in a conversation after that, that had I been present when that happened I would have terminated you. There is nothing national origin or race related to that exchange at all. Dr. Arani had been asked three times to do a patient discharge. When he finally got around to it he sent an email saying just to let you know I don't know why I had to do this. It wasn't my patient but I've done it. That pushed a button for Dr. Kuhn. And what Dr. Kuhn said in his resort to my attending. He did not say only a terrorist would do that. It's very distinct. They don't bleed over. As far as the fact of whether or not Dr. Arani was treated differently, the evidence is that the people that he raises as being comparators are not truly comparators. Dr. Nathie was a first year intern and he was actually overseeing her in that instance. She had no prior mistakes, no prior concerns. Dr. Goodnow who actually I think characterizes everything that's gone very well had not used the viral suturing in the same way that Dr. Goodnow's testimony is interesting in that he talks about orthopedics and the orthopedic residency program being demanding and being intimidating and being tough. And he too was called in front of the faculty and he said it was very difficult and he was asked do you want to do orthopedics just as was Dr. Arani. Dr. Goodnow is a Caucasian and he ended up leaving the program. Is that different because he left voluntarily and went into something else? The point is he was still questioned of whether or not it was the right thing for him. There is nothing beyond these comments that indicate that Dr. Kuhn had any national origin or race animus. There simply is nothing else that connects it. Did anything happen to Dr. Kuhn? Did someone counsel him? The only time he raised it was with Stevens. And I'll point out Dr. Stevens is a Ph.D. rather than an M.D. but the only time he raised it I believe on January 3rd or January 5th of 2012 well into his residency. And he raised the comments with her. Her testimony is that she then checked with Dr. Kuhn and asked him about it and she counseled him on it. So yes it was addressed. It was not something you want your program director to do. But again there is absolutely no evidence that reflects that these comments bled over into any of the remediation. And I think the remediation process itself is very, very telling here. Because Dr. Irani was in the remediation process in August of 2011. He was in the program for 22 months. He says these comments were made in the latter part of that which he described as November through 2012. If they all took place over a 2 or 3 month period does that make them seem more pervasive? How do we measure pervasiveness? Is it over the entire couple of comments over the entire time he was in the job or a couple of comments over a 2 or 3 month period? Well if you look at Farragher and Harris you're looking at the any number of factors. But I think you also look at the fact that he was in the program for a total of 22 months and there are only these comments that we're talking about. Do we forget about anything prior to that? No I don't think we do because I think it's indicative of the relationship of the faculty and Dr. Kuhn. And the remediation process started in August of 2011. But what's most interesting there, and this is with Dr. Kuhn fairing everything as he did as program director, is that the remediation process went up and down. Dr. Irani was remediated at a level 2 level. Dr. Kuhn met with him and he was going to move back down. Then when he was at the 3 and was suspended, again Dr. Kuhn and another faculty member met with him. He was going to move back down. Because they noticed along the way that he was making progress on his remediation plan. This is in the record that they acknowledge when he is doing good things and making progress. So it isn't just a straight shot as Dr. Irani would have us believe that Kuhn set his eye on him and they shot forward to termination. That's not the case at all. And we have laid out the full process in our brief. So I certainly don't need to go through it. But it is important that Dr. Irani was moving through it normally. There is absolutely no contention here that the faculty or Dr. Kuhn or anyone in the program went outside of the normal remediation process. He was remediated in a way that is consistent and is required by the ACGME. So there is nothing unusual there about the way the remediation process was happening. Another thing that is brought up, and I think this goes not to the pervasive issue and perhaps more to the claim of retaliation, but the timing. It is brought up that soon after this was reported these additional things happened. Again, that's not when the button was pushed. The remediation process had started well before he ever reported anything to Dr. Stephens. And the record clearly reflects that all parties involved, Dr. Stephens, Dr. Kuhn, Dr. Walsh, Dr. Walsh also is very involved in all of this as a department chair. The record reflects that all of their actions prior to Dr. Kuhn's reporting, I'm sorry, Dr. Irani's reporting of these comments is consistent with the way it continued to go forward. I know the district court found that retaliation and denial of grievance and the extension for the appeal don't even rise to the level of materially adverse actions. But you're saying that even if they did, there is a real causation problem. Yes, Your Honor. Dr. Stephens, well, the grievance process at this point, you go through Dr. Kuhn as the program director, Dr. Walsh as the department chair, and Dr. Stephens before going to a grievance committee. And at that point, all of those individuals prior to this reporting at all had all previously denied grievances of Dr. Irani. So their actions were consistent and there was no reason to believe those prior actions, that there was nothing to tie anything to them. Now the comment that was made about preferring English speaking residents, I think is very mischaracterized and just half that comment is being mentioned here this morning. The comment was that Dr. Kuhn said orthopedics gets the best residents. And I think it was internal medicine or something. It's lucky if they get residents who even speak English. Now maybe there's a dispute on how you look at that, but the emphasis to me is on the orthopedics gets the best residents. Dr. Irani was one of two people chosen for their program. Losing a resident is a big deal. I think you've fairly characterized this program as being very demanding. The record shows that. There was some evidence in the record from Dr. Irani that in the form of expert testimony suggesting that he was in fact meeting the reasonable expectations of a typical orthopedic program and that these demands were simply unreasonable and lent themselves to some suspicion because they were so unreasonable. What do you say about that? I'm not sure that's how I read the report, but assuming that that is. The expert may not have come to that conclusion, but I think that's the point that was trying to be made. This was all just a charade. It really wasn't about expectations. It was about a way to drum him out by imposing these just ridiculously unreasonable expectations. To that I can only say there was no evidence that the expectations of any other resident were different. Dr. Irani has not shown and cannot show that the expectations were different of him. Now he alleges this, but again to the things that the district court did bring up is that the expert testimony is really going, again I think it's more along the lines of a malpractice or was he meeting the standard of care. Dr. Irani was in training. They were looking for problems with any resident. You don't want to find there are problems when a resident kills someone or on the subject. I truly may be misremembering this. I thought the district court also said that the problem with the expert report is that it was based exclusively on what Dr. Irani had reported to the expert. Did the district court say that? That is accurate. The expert did not talk to any of the faculty or any of the doctors or anything of that sort. Even with that, well yes. The expert reviewed the medical records. I mean opposing council said the expert had reviewed the records. That is my understanding. I don't know what medical records he reviewed of them. Thank you. Mr. Williams. What are you here to talk about? That is a very good question. May it please the court. I am representing the University of South Carolina School of Medicine, Dr. Walsh and Dr. Kuhn. None of my clients are a party to the 1981 race discrimination. Can you move that mic a little closer to you? Yes, is that better? Thank you. My clients are not a party to the race discrimination claim in 1981 and based on the appellant arguments it does not appear that we are in the 1981 retaliation claim either. The district court held that USC School of Medicine was not Dr. Irani's employer and didn't have a contract with him and so could not be subject to a Title VII claim or a 1981 claim. Also University School of Medicine Why would academic deference apply if the university was not the doctor's employer? The university is responsible for the physician education and so they make academic decisions as to the residents. However, because I think we made the academic Horowitz argument in response to the Title VII and 1981 we rely on the academic nature of the decision in a residency program, but it really doesn't even get to us because we're not subject to Title VII or 1981 in this case. Also Dr. Irani did not appeal the district court's decision that no one with South Carolina School of Medicine was aware of any protected activity prior to his retirement. Based on the fact that we're not in the 1981 claims, I will very, very briefly touch on breach of contract, third party liability or beneficiary and liable and waive any additional time beyond that. Dr. Irani's amended complaint stated he was bringing a breach of contract intended third party beneficiary of accreditation agreement claim. We made some very serious argument to allege that his third party beneficiary claim was based on contracts between Palmetto Health and USC School of Medicine rather than the affiliation agreement. The district court held that Irani's revised claim failed because it was not fairly predicted by the amended complaint. USC School of Medicine submits the district court's ruling as to this procedural issue was correct. Even if Dr. Irani was the program letter appointment or accreditation agreement because the program did not lose accreditation. And the district court found that Dr. Irani was not the intended beneficiary of either of those two agreements between Palmetto Health and USC School of Medicine. South Carolina contract law carries a presumption that an individual who is not a party to a contract lacks privity to enforce it. And Dr. Irani has pointed to no legal precedent that would constitute overcoming that presumption. In terms of libel, Dr. Kuhn was asked to provide information to the California medical board. He did so in as limited a manner as he could possibly do. The California medical board said that's not enough. We need more information. Dr. Irani contacted him. Dr. Irani's counsel contacted him. You need to provide more information. He again was as neutral and gave as little information as possible because he was trying not to run afoul of Dr. Irani. The appellant's brief takes issue with the fact that Dr. Kuhn's memo states during the first month of this level two remediation, Dr. Irani was involved in two patient encounters that the faculty deemed below acceptable standards. USC School of Medicine and Dr. Kuhn submits that as a true statement based on the joint appendix, some of which has been mentioned today, where multiple members of the faculty found patient encounters below acceptable standards. I'm happy to answer any questions. Otherwise, that's everything that I wanted to address. Thank you very much. Mr. Ehrenberg, you've got some rebuttal time. Thank you, Your Honor. I will try not to use all that time. First, I just want to note there was a discussion of Dr. Stevens investigating and counseling Dr. Kuhn about the Ahmed the terrorist statement. The record actually said he was joking and that was the whole conversation. There was no counseling noted in the record. With regard to the level of discomfort and getting to the hostile work environment, we're not relying on just these two statements alone. It's not just Dr. Irani who commented on the discomfort that was created by Dr. Kuhn's treatment of Dr. Irani. JA 1434-35, that's the shark assignment, swimming with sharks. What I'd like to point out is that another doctor in the department found this assignment in the interaction between Dr. Kuhn and Dr. Irani to be particularly disturbing. At JA 2255, other residents in the program believed that Dr. Kuhn was on a witch hunt. It's not just Dr. Irani saying that he's being treated differently. It's others in the department noting that. While it's correct that Dr. Kuhn is not the head of the entire residency program, he's the head of the orthopedic residency program, which is what's relevant to Dr. Irani. With regard to the third party beneficiary argument, we do want to note that no, the agreement doesn't specify the Dr. Irani himself is a beneficiary, but the programs do state in the agreements, the affiliation agreement states that educational experiences will be provided in a manner consistent with ACGME requirements and federal and state laws. And it says that these experiences will be provided to residents of which Dr. Irani was a resident. I don't know who else that contract can be intended to benefit other than residents. That's what the program letter of agreement states. And the affiliation agreement states that the organizations will operate medical educational programs in compliance with regulatory and accreditation standards. And I believe the record reflects a number of instances through the grievance process where the ACGME requirements were not followed in terms of allowing a hearing at a grievance or considering an appropriate level of information, allowing Dr. Irani to present at a grievance hearing. And so it's clear to us that all of these rules are intended to benefit Palmetto Health employees who are medical residents. And that's all I have unless you have further questions. Thank you very much.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris